FILED
2009 Jul-21  PM 12:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

RONALD L. REYMOND,                          ]
                                            ]
        Plaintiff,                          ]
                                            ]
        vs.                                 ]        2:08-CV-853-LSC
                                            ]
MICHAEL J. ASTRUE,                          ]
Commissioner,                               ]
Social Security Administration,             ]
                                            ]
        Defendant.                          ]

MEMORANDUM OF OPINION

I.      Introduction.

        The claimant, Ronald L. Reymond, appeals from the decision of the

Commissioner of the Social Security Administration ("Commissioner") denying

his applications for a period of disability, disability insurance benefits

("DIB"), and supplemental security income ("SSI").  Mr. Reymond timely

pursued and exhausted his administrative remedies, and the decision of the

Commissioner is ripe for review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

        Mr. Reymond was thirty-eight years old at the time of the

Administrative Law Judge's ("ALJ's") decision, and he has a high school

education.  (Doc. 8 at 4, Tr. at 537.)  His past work experience includes employment as a warehouse worker, delivery driver, and an inventory clerk. (Doc. 8 at 4, Tr. at 563-64.)  Mr. Reymond claims that he became disabled on July 3, 2003, due to status post occipital condyle fractures, cognitive disorder, anxiety and mood disorder, status post spontaneous left pneumothorax, and left brachial plexus injury.  (Doc. 8 at 4, Tr. at 536.)

When evaluating the disability of individuals over the age of eighteen, the regulations prescribe a five-step sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920; *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001).  The first step requires a determination of whether the claimant is "doing substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If he or she is, the claimant is not disabled and the evaluation stops.  *Id*.  If he or she is not, the Commissioner next considers the effect of all of the physical and mental impairments combined.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  These impairments must be severe and must meet the durational requirements before a claimant will be found to be disabled.  *Id*.  The decision depends on the medical evidence in the record.  *See Hart v. Finch*, 440 F.2d 1340, 1341

(5th Cir. 1971).  If the claimant's impairments are not severe, the analysis stops.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  Otherwise, the analysis continues to step three, which is a determination of whether the claimant's impairments meet or equal the severity of an impairment listed in 20 C.F.R. pt. 404, subpt. P, Appendix 1.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the claimant's impairments fall within this category, he or she will be found disabled without further consideration.  (*Id.*)  If they do not, a determination on the claimant's residual functional capacity ("RFC") will be made and the analysis proceeds to the fourth step.  20 C.F.R. §§ 404.1520(e), 416.920(e).

The fourth step requires a determination of whether the claimant's impairments prevent him or her from returning to past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant can still do his or her past relevant work, the claimant is not disabled and the evaluation stops.  *Id.*  If the claimant cannot do past relevant work, then the analysis proceeds to the fifth step.  *Id.*  Step five requires the court to consider the claimant's RFC, as well as the claimant's age, education, and past work experience in order to determine if he or she can do other work.  20 C.F.R.

§§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the claimant can do other work, the claimant is not disabled.  *Id.*

Applying the sequential evaluation process, the ALJ found that Mr. Reymond has not engaged in substantial gainful activity since the alleged onset of his disability.  (Tr. at 35.)  According to the ALJ, Plaintiff has the following severe impairments: "status post occipital condylar fractures; cognitive disorder, not otherwise specified, anxiety and mood disorder; history of opiate, alcohol and benzodiazephine abuse; status post spontaneous left pneumothorax, and left brachial plexus injury." *Id.* at 36. However, he found that these impairments neither meet nor medically equal any of the listed impairments in Appendix 1, Subpart P, Regulations No. 4. *Id.*  The ALJ further found that, in considering the statements of Claimant and Claimant's father regarding Claimant's impairments, the statements "are not fully credited in light of discrepancies between claimant's assertions and information contained in the reports of the treating and examining practitioners."  *Id.*  The ALJ determined that, based upon the medical records, "documented precipitating and aggravating factors, prescribed medication, treatment, functional restrictions, daily activities,

and work record," Mr. Reymond has the residual functional capacity to "perform the exertional demands of sedentary work with the additional limitations of occasional bending, stooping and squatting and no climbing, driving or work around unrestricted heights.   The claimant requires a temperature controlled environment and is able to perform simple, non-complex tasks."   *Id*. at 34, 36.

The ALJ then determined Claimant cannot perform any past relevant work.  (Tr. at 36.)  However, given his age, education, work experience, and RFC,  the ALJ determined that Mr. Reymond could perform specific jobs that exist in a significant number in the national economy.  *Id*. at 36-37.  These jobs include work as an inspector, sorter, wrapper, packager, assembler, cashier, telephone answering clerk, and material handler.   *Id*. at 37.  Accordingly, the ALJ entered a finding that Plaintiff "was not under a 'disability,' as defined in the Social Security Act, at any time through the date of this decision."  *Id*.

II.    Standard of Review.

The Court's role in reviewing claims brought under the Social Security Act is a narrow one.  The scope of its review is limited to determining (1)

whether there is substantial evidence in the record as a whole to support the findings of the Commissioner, and (2) whether the correct legal standards were applied. *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).   The Court approaches the factual findings of the Commissioner with deference, but applies close scrutiny to the legal conclusions.  *See Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).   The Court may not decide facts, weigh evidence, or substitute its judgment for that of the Commissioner.  *Id*.  "The substantial evidence standard permits administrative decision makers to act with considerable latitude, and 'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'"  *Parker v. Bowen*, 793 F.2d 1177, 1181 (11th Cir. 1986) (Gibson, J., dissenting) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)).  Indeed, even if this Court finds that the evidence preponderates against the Commissioner's decision, the Court must affirm if the decision is supported by substantial evidence. *Miles*, 84 F.3d at 1400.  No decision is automatic, however, for "despite this deferential standard [for review of claims] it is imperative that the Court

scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987). Moreover, failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

III.   Discussion.

Mr. Reymond alleges that the ALJ's decision should be reversed because it is not supported by substantial evidence and applicable law for one reason.  (Doc. 8.)  Plaintiff claims that the ALJ did not afford proper consideration to Claimant's treating and examining sources.  *Id*.

Plaintiff claims that the ALJ failed to accord proper weight to Claimant's consultative psychologist, Dr. Jon G. Rogers, and to Plaintiff's hospice nurse, Richard Simonson.   In determining disability, the ALJ considers evidence from "acceptable medical sources," which include licensed physicians and licensed or certified psychologists.  20 C.F.R. § 416.913(a).  The ALJ can consider evidence not only from medical sources, but also "evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work."  20 C.F.R. § 416.913(d).  These "other sources" can include nurses.  *Id*.  "The better an

explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. § 416.927(d)(3). The weight given to opinions of non-examining sources "will depend on the degree to which they provide supporting explanations for their opinions." *Id.*

A treating physician's testimony is entitled to "substantial or considerable weight unless 'good cause' is shown to the contrary." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)) (internal quotations omitted). The weight to be afforded a medical opinion regarding the nature and severity of a claimant's impairments depends, among other things, upon the examining and treating relationship the medical source had with the claimant, the evidence the medical source presents to support the opinion, how consistent the opinion is with the record as a whole, and the specialty of the medical source. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d). Furthermore, "good cause" exists for an ALJ to not give a treating physician's opinion substantial weight when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent

with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004) (*citing Lewis*, 125 F.3d at 1440); *see also Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991) (holding that "good cause" existed where the opinion was contradicted by other notations in the physician's own record).

In reviewing the ALJ's opinion, there is no doubt that it was supported by substantial evidence and proper consideration was given to the opinions of Dr. Rogers and Richard Simonson. The ALJ presented a lengthy, detailed opinion of the Claimant's accidents, injuries, alcohol abuse, and the treatments involved. (Tr. at 15 - 35.) Prior to Claimant's alleged date of disability, Claimant was hospitalized numerous times. *Id*. at 15-17. On March 18, 2003, Claimant was hospitalized for a spontaneous left pneumothorax, a chest tube was inserted, and he was discharged on March 22, 2003, with only a minimal pneumothorax remaining. *Id*. at 15. However, as the ALJ noted, in the month prior to the alleged date of disability, Claimant sought hospital treatment no less than five times for alcohol detoxification. *Id*. On those occasions, Claimant's blood alcohol level

ranged from 0.22 to 0.55.[1]  *Id*.

On July 3, 2003, Claimant's alleged date of disability, he was involved

in a car accident.  (Tr. at 17.)  He was intoxicated at the time.  As noted by

_____

[1]On May 25, 2003, Claimant's family took him to the emergency room of Carraway Methodist Medical Center ("Carraway"), with a blood alcohol level of 0.49.  (Tr. at 15.)  Claimant left the emergency room against medical advice.  *Id*. at 16.  On May 27, 2003, Claimant went to Brookwood Medical Center ("Brookwood") "requesting detoxification due to alcohol abuse," at which time it was noted that he was previously detoxed in January 2003.  He was diagnosed with alcohol dependence, opiate dependence, benzodiazepine abuse and depression.  Claimant again left against medical advice on May 28, 2003.  Claimant once again returned to Brookwood on June 2, 2003, requesting help for his alcohol problem.  Claimant stated he had been arrested for public intoxication on May 30, 2003, and had not had a drink since that time.  Claimant's "detoxification progressed well . . . and his depression improved," and he was discharged on June 9, 2003, with diagnoses of alcohol dependence, opiate dependence, benzodiazepine abuse and depresion.  *Id*.  However, Claimant began drinking within three days of discharge, and was arrested with a blood alcohol level of 0.51.  Claimant's brother took him back to Brookwood for detoxification on June 15, 2003.  Again, his "detoxification progressed well . . . [and] depression also improved."  He was discharged on June 13, 2003, with diagnoses of alcohol dependence and depression.  *Id*. at 16-17.  Then, on June 27, 2003, Claimant returned to Carraway, complaining of "inability to use his legs."  Although he was shown to have decreased sensation and motor strength in the lower extremities, a head CT scan was normal and his blood alcohol level was .299.  He was prescribed several vitamins and minerals, and discharged with a diagnosis of alcoholism and instructed to stop drinking.  That same day, after discharge, Claimant returned to Brookwood for detoxification with a blood alcohol level of .22.  He was discharged on June 30, 2003.  *Id*.

the ALJ, Claimant was taken to the University of Alabama at Birmingham Hospital ("UAB") where he was diagnosed with a comminuted left occipital condyle fracture, right occipital condyle fracture, left lateral mass C1 fracture, small liver laceration and a 20 centimeter avulsion injury to the scalp.  Claimant had surgery to repair the scalp avulsion and was placed in a cervical collar  to treat the occipital condyle fractures.  On July 11, 2003, Claimant was discharged and advised to continue with an alcohol dependence program.   No medication was prescribed for any type of psychiatric disorder.  *Id*.

Following Claimant's discharge, the ALJ noted that Claimant followed up with several physicians.  (Tr. at 18-28.)  Importantly, Claimant visited Dr. L. Douglas Alford on several occasions, not only after the July 3, 2003 date, but several times before said date as well.[2]  (Tr. at 15-28, 253-65.)   On August 27, 2003, Claimant complained to Dr. Alford of head, neck and back pain.  Dr. Alford placed Claimant on Augmentin due to a scalp infection and

[2]Claimant began seeing Dr. Alford after his release from Carraway Methodist Medical Center, where he was treated for a large spontaneous left pneumothorax, in March 2003.  (Tr. at 15, 260-64).  Claimant visited Dr. Alford on March 27, 2003 (complaining of bad temper and anxiety), April 2, 2003 (for pulmonary function testing), and again on April 21, 2003 (complaining of a rash and insomnia).  *Id*.

increased his dosage of Clonidine due to elevated blood pressure.  *Id*. at 18,

259.  Claimant returned to Dr. Alford once during each of the four following

months.  During that time, Dr. Alford noted that Claimant's scalp wound

healed, Claimant claimed to be feeling better and claimed to be drinking less

alcohol.  Dr. Alford prescribed Lorazepam for Claimant's depression.  *Id*. at

18-21, 256-58.  When Claimant last saw Dr. Alford on December 15, 2003, Dr.

Alford noted he was able to go without his cervical collar.  Further, Claimant

denied any headaches, blurred vision, chest pain or shortness of breath, and

indicated that he had not been drinking alcohol for several months.  *Id*. at

21.  However, Dr. Alford tested Claimant's blood alcohol level and found it

to be at .73.  *Id*.

Claimant also frequently visited Dr. James Markert following his

discharge from UAB in July 2003.  (Tr. at 18, 280-99.)  On August 13, 2003,

Claimant was examined by Dr. Markert due to weakness of the left upper

extremity.  Dr. Markert found "mild diffuse weakness in the upper extremity

proximally," weak intrinsics and adductors, and no significant cord or root

compression.  *Id*. at 18, 292.  Dr. Markert also performed tests on Claimant

on August 14, 2003, which evidenced a "left brachial plexus injury,

predominantly involving the lower trunk." *Id*. at 18, 289-91. On October 8, 2003, Claimant again saw Dr. Markert. *Id*. at 19, 281-88. Claimant informed him of improvement in his arm pain and tingling, but complained of non-specific pain. Dr. Markert noted that while Claimant had been told to increase his dosage of Neurontin[3], Claimant had not done so, nor did he take the medication on a regular basis. At this time, Dr. Markert removed Claimant's cervical collar and noted "intact flexion and extension with some neck pain, but no arm or leg symptoms" and "minimal residual weakness in the left upper extremity," which was vastly improved from Claimant's prior visit. *Id*. He told Claimant "that he was doing well and could begin to wean himself out of the cervical collar." *Id*. at 20, 281-88. Claimant's last visit (of record) to Dr. Markert was on January 7, 2004. *Id*. at 21, 280. Claimant complained of neck spasms, anxiety and stress, but reported improvement

---

[3]Dr. Chi-Tsou Huang placed Claimant on Neurontin on August 28, 2003, based upon his findings of a slight claw hand on Claimant's left upper extremity, decreased sensation in the ulnar distribution and medical part of the upper arms, and a left brachial plexus injury. (Tr. at 18, 251-52.) Claimant returned to Dr. Huang on September 5, 2003, with complaints of pain in the left cervical paravertebral muscles causing numbness in his fingers. Dr. Huang told Claimant to continue wearing the cervical collar and continue taking Neurontin. *Id*. at 18, 249-50.

otherwise.  Claimant stated he weaned out of the cervical collar[4] and stopped taking Neurontin.  Dr. Markert noted "nearly normal strength in his left deltoid, triceps and intrinsics", normal power, presence of bilateral postural tremor, "fine motor movements were reachable, as were his rapid alternating movements", no evidence of myelopathy, normal casual and tandem gait, "no evidence of any instability related to claimant's occipital condylar fractures."  Finally, he noted Claimant was "doing well," and should return for a follow-up in six months.  *Id*.

Claimant also received treatment from Dr. James Koehler.  (Tr. at 19, 302-05.)  Claimant first saw Dr. Koehler on September 10, 2003, complaining of some scalp pain, but was otherwise doing better since his surgery in July 2003.  Dr. Koehler's examination found Claimant's wounds had "healed nicely with no evidence of infection," and that Claimant's progress was satisfactory.  *Id*. at 18, 305.  Claimant saw Dr. Koehler again on November 12, 2003, with no complaints.  *Id*. at 20, 304.  Claimant told Dr. Koehler that

---

[4]Despite the fact Claimant told Dr. Markert he weaned himself out of the cervical collar, Claimant testified at the hearing that he slept in his cervical collar several nights a week.  Claimant also testified that he did not wear it to the hearing because the collar made it difficult to speak.  (Tr. at 31, 541, 549.)

his "pain had resolved."  Dr. Koehler observed that Claimant's wounds had "healed nicely with no evidence of infection" and "minimal scarring," and released Claimant from care, with followup as needed.  *Id.*

Another doctor noted by the ALJ who was involved in Claimant's treatment was Dr. Jonathan Westfall, a psychiatrist.  (Tr. at 18, 348-49.)  On April 3, 2004, Claimant went to the emergency room of Medical Center East, complaining of shortness of breath.  *Id.* at 23, 436-84.  He was diagnosed with spontaneous pneumothorax.  A chest tube was inserted for this problem.  *Id.*  While in the hospital, Claimant "exhibited episodes of confusions and lack of orientation as he was found wandering the halls of the hospital," resulting in a psychiatric consultation on April 7, 2004, by Dr. Westfall.  *Id.* at 18, 348-49.  Claimant's mother was present for the consultation.  Dr. Westfall noted that Claimant was initially misleading about his alcohol consumption prior to admission, and  Claimant's mother stated Claimant had been drinking until just prior to admission.  At that time, Claimant was not attending Alcoholics Anonymous and his mother noted Claimant recently overused pain medications.  *Id.*

During the consultation, Dr. Westfall observed that Claimant "seemed

misleading about his substance problems," his mood was euthymic, his

thought process was goal directed and based in reality, and he did not suffer

from auditory or visual hallucinations.  *Id*. at 18, 348-49.  Further, he found

Claimant was able to make decisions himself, although his insight into his

own substance problem was poor.  Dr. Westfall assessed Claimant with a

history of alcohol dependence, and found that withdrawal may have

contributed to  confusion he suffered while in the hospital, although he also

recognized that the head injury suffered by Claimant may account for some

delirium.  *Id*.  Dr. Westfall recommended Claimant return to Alcoholics

Anonymous and engage in outpatient treatment for substance abuse.  Upon

Claimant's discharge on April 8, 2004, Dr. Westfall noted Claimant's

psychosis had resolved and opined that the psychosis was alcohol related.

He noted that Claimant needed to refrain from alcohol use, but Claimant

refused a referral to Bradford for treatment.[5]  *Id*.

_____

[5]Claimant was taken the emergency room several times after his discharge on
April 8, 2004.  (Tr. at 24-25.)  On September 14, 2004, Claimant was involved in a
motor vehicle accident, treated for a laceration to his right ear and released.
Claimant was "severely intoxicated and disoriented" at the time.  *Id*. at 24.  On June
3, 2005, Claimant was again admitted because, according to family members, he had
been "drinking all day and was found unresponsive and bluish in appearance."  *Id*.
His blood alcohol level was .352.  He was discharged on June 10, 2005, and instructed

In November 2005, Dr. Westfall again performed a consultation with Claimant. (Tr. at 26, 401-04.) At the time, Claimant was again at Medical Center East due to complaints of vomiting and abdominal pain.[6] Claimant had been hospitalized in the Intensive Care Unit for four days when Dr. Westfall examined him due to severe agitation, elevated heart rate, sweating and tremulousness. *Id*. Dr. Westfall assessed Claimant to be suffering from alcohol dependence/abuse and did not believe Claimant could succeed at rehabilitation. *Id*. Upon Claimant's discharge on November 18, 2005, Dr. Lori A. Lynn noted Claimant was stable and in an improved condition, but he had no desire to quit drinking. She further noted that both she and Dr. Westfall repeatedly discussed with Claimant the fact that he was

---

to stop drinking and seek outpatient treatment for abuse of alcohol and benzodiazepine dependence. *Id*. at 24-25. On August 18, 2005, Claimant returned to the emergency room with complaints of a right ear infection. *Id*. at 25. He was prescribed antibiotics and discharged the same day. Again, on September 27, 2005, he returned with back and ankle pain, which resulted from lifting a lawnmower. His ankle was placed in an air cast due to a "questionable cuboid fracture." Claimant was prescribed Lortab, Flexeril and Naprosyn and discharged. *Id*.

     [6]Claimant was admitted on November 8, 2005. He reported drinking around twelve beers a day. Claimant was diagnosed with alcoholic hepatitis and acute pancreatitis. While the pancreatitis settled quickly, the alcoholic hepatitis was severe, thus he was hospitalized for several days, with his liver enzymes slowly trending downwards. (Tr. at 26, 401-19.)

killing himself. *Id*. at 27, 499-501. It was at this time that Dr. Lynn sent

Claimant home with hospice care because his prognosis was very poor. *Id*.

Claimant was discharged from hospice prior to the hearing because,

according to Claimant, his liver had "healed." *Id*. at 33.

While the ALJ considered the opinions of both Dr. Jon G. Rogers and

Richard Simonson, he gave little weight to both opinions. Dr. Rogers

performed a consultative psychological examination on Claimant on March

4, 2004, only one month prior Dr. Westfall's initial evaluation. (Tr. at 22-23,

34, 306-12). As noted by the ALJ, Dr. Rogers concluded Claimant suffered

from "cognitive disorder, not otherwise specified, due to traumatic brain

injury; mood disorder (depression) due to traumatic brain injury; anxiety

disorder, not otherwise specified, due to traumatic brain injury and alcohol

abuse." *Id*. at 22, 306-12. However, during the examination, Claimant

informed Dr. Rogers that for the past fifteen years, he had a drinking

problem, at times drinking up to three bottles of vodka and twelve to

twenty-four beers a day. *Id*. In fact, Claimant reportedly consumed three

to four beers prior to Dr. Roger's examination. *Id*. Claimant also informed

Dr. Rogers that he used marijuana and narcotics over a fifteen year period

and "experienced delirium tremens, alcoholic amnestic episodes and blackouts." *Id.* The ALJ concluded that the opinion of Dr. Rogers "was based on the claimant's functional ability with continued alcohol use. As the claimant no longer abuses alcohol and does not allege a psychiatric impairment, the undersigned has placed no particular weight on Dr. Rogers' statements." *Id.* at 34.

The ALJ also considered the opinion of Richard Simonson, the registered nurse who provided hospice care to Claimant. (Tr. at 25-26, 33, 394-98.) On October 16, 2005, Mr. Simonson completed a series of forms. *Id.* at 25-26, 394-98. According to the physical evaluation form, Claimant could lift and carry up to ten pounds occasionally; sit for two hours and walk for one hour combined during an eight hour day; could occasionally push/pull, perform fine manipulation, bend, stoop and reach; could never climb, balance or perform gross manipulation, nor could he operate a motor vehicle or work around hazardous machinery, dust, allergens or fumes. *Id.* at 25, 394-98. On the clinical assessment of pain form, Mr. Simonson noted Claimant's pain was enough to "be distracting to the adequate performance of daily activities or work"; bed rest and/or medication would result from

pain due to physical activity; and Claimant was completely restricted by medication side effects.  *Id*. at 26, 394-98.   Finally, on the clinical assessment of fatigue/weakness form, Mr. Simonson found Claimant's fatigue/weakness were strong enough to "negatively affect the adequate performance of daily activities or work"; fatigue/weakness would be increased so much by physical activity as to result in bed rest and/or medication; and side effects of drugs would limit Claimant's effectiveness due to "distraction, inattention or drowsiness."  *Id*.  However, as the ALJ noted, "[n]o records verifying Mr. Simonson's treatment of the claimant were submitted into evidence."  *Id*. at 33.  Further, although Mr. Simonson completed the forms in October 2005, Claimant was not actually placed into hospice care until November 2005.  *Id*.  Due to these facts, and the fact Mr. Simonson is not a medical doctor, nor did any of Claimant's treating physicians place any limitations on Claimant's ability to work, the ALJ correctly determined that no weight should be placed on Mr. Simonson's report.  *Id*.

In addition to the opinions of the doctors and Mr. Simonson, the ALJ also considered the testimony of Claimant himself and Claimant's father.

(Tr. at 27-28, 31-33).  Although Claimant and his father claim that pain and fatigue from the July 2003 motor vehicle accident, as well as his history of spontaneous pneumothorax, prevent Claimant from working, the ALJ found these statements were not completely credible given the medical evidence. *Id.* at 31.  Further, given the records of Dr. Alford and Dr. Koelher, the ALJ discredited Claimant's testimony that he "has to lie down for several hours during the day and is extremely limited in his ability to sit, stand, walk, lift, carry and bend due to pain and fatigue."  *Id.*  Although Claimant testified that he still wore his cervical collar, the ALJ found that testimony to be contradictory to the evidence of record previously noted from Dr. Markert and Dr. Alford.[7]  *Id.*  The ALJ further considered the records from Medical Center East to discredit Claimant's allegations of ongoing pain and limitation due to pancreatitis and alcohol hepatitis[8] because the records showed that both resolved with abstinence from alcohol.  *Id.* at 32.  Lastly, although Claimant alleges he requires a cane for ambulation, the ALJ noted that while he may have required a cane following his hospitalization in November

---

[7]*See supra* pp. 12, 14 and note 3.

[8]*See supra* note 5.

2005, nothing in the record indicates that Claimant continues to require such assistance.  *Id*. at 33.

Based upon the medical evidence of record as presented above, the ALJ considered the record as a whole and accorded proper weight to the opinions discussed.

IV.    Conclusion.

Because the Court finds that the Commissioner's final decision applies the proper legal standards and is supported by substantial evidence, the decision of the Commissioner will be affirmed by separate order.

Done this <u>21st</u> day of <u>July 2009</u>.

_____

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
153671